WELL SURVEYS, INCORPORATED,
Plaintiff,

v.

McCULLOUGH TOOL COMPANY,
Defendant.

McCULLOUGH TOOL COMPANY, Robert W. Pringle, Kenneth I. Roulston, George M. Brownell, and Philip W. Martin, Plaintiffs,

v.

WELL SURVEYS, INCORPORATED, and Dresser Industries, Inc. (substituted for Lane-Wells Company), Defendants.

United States District Court
N. D. Oklahoma.

March 16, 1961.

As Amended Aug. 25 and Oct. 18, 1961.

District of Texas, Houston Division, under Civil Action No. 9817 of said Court, by Well Surveys, Incorporated, a Delaware Corporation, having its principal place of business in Tulsa, Oklahoma. This action arose under the patent laws of the United States and this Court has jurisdiction thereof under 28 U.S.C. § 1338(a). The Complaint alleged infringement by McCullough Tool Company, which is a Nevada Corporation having places of business in Los Angeles, California, Houston, Texas, and Tulsa, Oklahoma, of United States Patents Re. 23,226 and 2,308,361. Said Action was thereafter, transferred by order of the Honorable Judge Joe Ingraham of the District Court for the Southern District of Texas, Houston Division, by an Order dated July 30, 1957 to this Court, wherein the Action was duly filed on August 2, 1957 under Civil Action No. 4271.

R. Whelton Whann and Robert M. McManigal, James E. Harrington, Los Angeles, Cal., Williams, Boesche & McDermott, Tulsa, Okl., Hill, Sherman, Meroni, Gross & Simpson and Carlton Hill, Chicago, Ill., for McCullough Tool Co.

Fulwider, Mattingly & Huntley, Los Angeles, Cal., McAfee, Hanning, Newcomer & Hazlett and Rufus Day, Jr., Cleveland, Ohio, Farmer, Woolsey, Flippo & Bailey, Robert K. Schumacher, Tulsa, Okl., for Wells Surveys, Inc.

SAVAGE, Chief Judge.

The above-entitled consolidated causes having come on regularly for trial and evidence both oral and documentary having been introduced, the Court, having duly considered said evidence and the arguments of counsel and being fully advised in the premises, now makes the following findings of fact and conclusions of law herein.

### Findings of Fact

#### General Findings

1.

Civil Action No. 4271 was originally filed on June 15, 1956 in the United States District Court for the Southern

2.

The Complaint in Civil Action No. 4271 was amended several times by adding and deleting patents owned by Well Surveys, Inc. that were charged to be infringed by McCullough Tool Company. The Fifth and last Amended Complaint charged infringement of nine (9) patents owned by Well Surveys, Inc. Subsequently and before trial, by stipulation of the parties, the Complaint was dismissed with prejudice as to Patents No. 2,285,840 and No. 2,303,688, and without prejudice but with waiver of damages prior to the filing of the stipulation with the Court as to Patents No. 2,636,994 and No. 2,689,918.

3.

At the time of trial, Well Surveys, Inc., hereinafter sometimes referred to as WSI, charged McCullough Tool Company, hereinafter sometimes referred to as McCullough, with infringement of the following patents: Bender Reissue No. Re. 23,226; Fearon No. 2,308,361; Fearon No. 2,390,433; Swift No. 2,554,844; Fearon Reissue No. Re. 24,226.

4.

Civil Action No. 3956 was filed in this Court on June 15, 1956 by McCullough

Tool Company under 28 U.S.C. § 2201 and 28 U.S.C. § 1338(a) alleging misuse by WSI of all of its patents as listed in Exhibit A attached to the Complaint, and asking for a declaratory judgment of unenforceability, invalidity and non-infringement of said patents. By subsequent amendment to the Complaint, a charge of infringement of Patent No. 2,686,266, issued to the Plaintiffs Pringle, Roulston and Brownell, all of whom are citizens of the Dominion of Canada, and Patent No. 2,686,268, issued to Plaintiffs Martin and Pringle, above-named, was added and Lane-Wells Company, then a California corporation and now a division of Dresser Industries, Inc., was added as a party defendant to said charge of infringement. By further amendment, the said Robert W. Pringle, a resident of Edinburgh, Scotland, Kenneth I. Roulston, a resident of Winnipeg, Canada, George M. Brownell, a resident of Winnipeg, Canada, and Philip W. Martin, a citizen of the United States and a resident of Whittier, California, the above-named patentees, were added as parties Plaintiff. Dresser Industries, Inc., a Delaware corporation was subsequently substituted as a party Defendant in the place and stead of Lane-Wells Company.

5.

By pre-trial order dated March 31, 1960, said Civil Action Nos. 4271 and 3956 were consolidated for all purposes, it being further stipulated and ordered that WSI made no charge of infringement of any of the patents listed in the Complaint in Action No. 3956 other than the five (5) patents in suit in Civil Action No. 4271 and that the question of validity of all WSI patents not in suit in Civil Action No. 4271 was moot. It was further stipulated and ordered in said pre-trial order that there was no issue before the Court with respect to any of the claims of any of the patents in suit in either action other than the claims specified by the respective parties in answers to interrogatories then on file, which claims in issue will be enumerated hereinafter in findings dealing with specific patents.

6.

Well Surveys, Inc., was incorporated on May 4, 1939 to carry forward the research and development work concerning radioactivity well logging then being done by Engineering Laboratories, Inc. looking toward the development of commercial methods of radioactivity well logging and apparatus therefor. Such methods and apparatus were subsequently developed and offered commercially to the oil industry by Well Surveys, which continued to engage in research and development relating to methods and apparatus for radioactivity well logging.

7.

Prior to the introduction of radioactivity well logging, there had long existed a well recognized need for logging through casing. Radioactivity well logging was the first method to successfully log through casing, and it is still the only method available to the oil industry for logging through casing. Radioactivity well logging can also be, and often is, used to log open holes, i. e., wells before they are cased. WSI and Lane-Wells were the first to offer commercial natural gamma ray logging and neutron logging services to the oil industry. In 1940, the first year of the commercial radioactivity well logging industry, the gross sales amounted to $32,165. In 1948 the gross sales by Lane-Wells for radioactivity well logging amounted to more than $3,000,000.

8.

While the term radioactivity well logging was originally applied to methods of detecting and measuring radiation naturally emitted by the earth's formations surrounding a well, it soon became a generic term and now is used to designate any well logging in which radiations coming from the formations, whether they be natural or artificially produced, are detected and measured. At the present time, the more commonly used kinds of radioactivity well logging are natural gamma ray logging, neutron

logging, and gamma ray-gamma ray logging. Various special types of radioactivity well logging have also been proposed and some have been used commercially as will be mentioned in later findings. Radioactivity well logging is sometimes called radioactivity well surveying or radiation well logging.

### 9.

Natural gamma ray logging is the process whereby gamma rays naturally emitted by formations traversed by a bore hole are measured. Natural gamma ray logging is performed by the parties by lowering into the bore hole a tool containing a radiation detector which, as a result of the impingement thereon of gamma rays naturally emitted by the formations, produces output signals indicative of said gamma rays, transmitting said signals to the earth's surface, and utilizing said signals to produce a record of gamma rays detected in correlation with the depth of said detector in the bore hole. The record thus obtained by the parties in the form of a curve indicating relative number per unit of time of natural gamma rays at different depths, is a conventional natural gamma ray log, sometimes simply called a gamma ray log.

### 10.

Neutron logging is the process whereby formations traversed by a bore hole are bombarded with neutrons and radiations emitted by said formations as a result of said bombardment are measured. Neutron logging is performed by the parties by lowering into the bore hole a tool containing a neutron emitting source and a detector which produces output signals indicative of the radiation impinging thereon as a result of neutron bombardment of the formations, transmitting said output signals to the surface of the earth, and utilizing said signals to produce a record of radiation detected in correlation with the depth of said detector in the bore hole. The record thus obtained by the parties in the form of a curve indicating relative number per unit of time of radiations emitted at different depths by the subsurface formations as a result of the neutron bombardment is a conventional neutron log. As a result of neutron bombardment a formation may emit either neutrons or gamma rays or both. When the gamma rays are detected, the resulting neutron log is termed a neutron-gamma ray log. When the neutrons are detected, the resulting neutron log is termed a neutron-neutron log. When fast neutrons are detected, the resulting log is termed a neutron-fast neutron log.

### 11.

Gamma ray-gamma ray logging is the process whereby gamma rays emitted by the subsurface formations as a result of gamma ray bombardment thereof are measured. Gamma ray-gamma ray logging is performed by the parties by lowering into the bore hole a tool containing a gamma ray emitting source and a gamma ray detector which produces output signals indicative of the gamma rays impinging thereon as a result of said bombardment, transmitting said output signals to the earth's surface, and utilizing said signals to produce a record of gamma rays detected in correlation with the depth of said detector in the bore hole. The record thus obtained by the parties in the form of a curve indicating relative number per unit of time of gamma rays emitted at different depths by the subsurface formations as a result of the gamma ray bombardment is a conventional gamma ray-gamma ray log, sometimes called a gamma-gamma log, or a scattered gamma ray log. Gamma ray-gamma ray logging may be used to indicate formation density and when so used is usually called density logging.

### 12.

Spectral logging involves discerning the energies or wave lengths of gamma rays given off by various elements within the formations surrounding the well bore and presenting this information at the surface of the earth in the form of gamma ray spectra. It thus permits discrimination between the various elements. Spectral logging is the process

of detecting and measuring the energy of the gamma radiation in addition to the intensity thereof, thereby permitting a distinction to be made in the gamma ray emissions of radioactive substances of different characteristics and in the nature of the neutron capture gamma rays emitted by the nuclei of different materials; it is thus distinguished from conventional gamma ray, neutron-gamma ray and gamma ray-gamma ray logging which involve merely the measurement of the total intensity of all of the gamma rays impinging upon the detector with energies above some threshold level.

### 13.

Lane-Wells Company was the first service company licensed by Well Surveys, Inc. and in 1940 obtained equipment from Well Surveys, Inc. and started offering natural gamma ray logging as a commercial service to the oil industry. By 1942, Well Surveys had developed neutron logging to a commercial state and Lane-Wells started offering this additional service to its customers. Lane-Wells Company, as a separate corporation and more recently as a division of Dresser Industries, has continued to offer natural gamma ray and neutron logging services to the trade.

### 14.

McCullough Tool Company first offered natural gamma ray logging service to the industry in 1950 and soon thereafter offered neutron logging service and since that time has continued to supply both types of logging to its customers. In performing these services McCullough has always used scintillation counters. The methods and equipment used by McCullough in performing gamma ray logging and neutron logging for hire are illustrated in WSI Patent Ex. 10 which is a booklet of drawings, each lefthand page representing the drawings of one of the WSI patents in suit and each righthand page being an illustration of the corresponding McCullough equipment and method. Said drawings contained in WSI Ex. 10 were admitted to be substantially accurate representations

of the equipment they portray and to contain no error or incompleteness in any way affecting this case.

### Findings Directed Primarily to Bender Patent No. Re. 23,226

### 15.

The application for the original Bender patent was filed by John C. Bender on February 18, 1936 and was issued to Lane-Wells Company on October 18, 1938 as Patent No. 2,133,776. Application for reissue was filed on October 4, 1940 and said patent was reissued to Lane-Wells Company on May 9, 1950 as Re 23,226. Said reissue patent was subsequently assigned by Lane-Wells Company to Well Surveys together with all rights to recover for infringement thereof, and is sometimes herein referred to as the Bender patent. The Bender invention pioneered the wholly new art of radioactivity well logging. The Bender patent was the first to disclose and teach natural gamma ray logging and is a primary and pioneer patent. The method of practicing natural gamma ray logging as fully disclosed by said patent comprises traversing the various strata of a well with a radiation detector to produce electrical signals indicative of the natural radioactivities of the strata, transmitting said signals to the surface and there recording them in correlation with depth to produce a log giving information concerning the lithology of said formations. No such log had ever been made prior to Bender's invention. This was a new and useful result never before obtained. The specific radiation detector disclosed by Bender was a Geiger counter which produces an electrical impulse for each gamma ray detected. Well Surveys first performed radioactivity well logging commercially in the spring of 1940 utilizing the invention of the Bender patent.

### 16.

Claims 14, 15, 16, 19 and 20 of the Bender patent are in issue in this case. Each of said claims in issue is limited to a method or apparatus for measuring *in*

*situ* radiations from formations traversed by a bore hole, to produce a radioactivity log of said subsurface formations as distinguished from the taking of formation samples to the surface and there measuring their radioactivity, or the mere measuring of the radioactivity of surface rocks.

17.

Earth formations exhibit to a greater or lesser degree some natural gamma ray activity. Shales and clays contain relatively large amounts of materials which naturally emit gamma rays; whereas sandstones and limestones contain relatively small amounts of natural gamma ray emitting materials.

18.

Page 1A of WSI Exhibit No. 10 and WSI Exhibit No. 11 (A, C and D) illustrate the natural gamma ray logging apparatus utilized by McCullough since 1950. Reference to said exhibits and the uncontroverted testimony of witnesses clearly shows that the method of natural gamma ray logging used by McCullough comprises lowering a scintillation counter type of radiation detector into the bore hole, exposing said detector to the gamma rays from the subsurface formations thereby generating pulse type electrical signals at a rate indicative of the intensity of said gamma rays from the respective formations, and continuously transmitting said signals over the logging cable to the surface equipment where they are counted by a rate meter, the output of which is continuously recorded during logging operations in correlation with depth of subsurface instrument, whereby the formations may be differentiated by intercomparison of their respective gamma ray intensities recorded for the various levels. The rate of occurrence of the electrical pulses generated by the McCullough apparatus is a quantitative measure of the natural gamma ray activity of the formation adjacent the counter. The steel housing of the McCullough subsurface instrument is relatively transparent to the natural gamma rays emanating from the formations and also is mechanically resistant, thereby to protect the scintillation counter. Said method practiced by McCullough includes each and every step recited in the Bender method Claims 14, 15, 19 and 20 and the McCullough apparatus used in said method includes each and every element of Bender apparatus Claim 16. Each of the Bender claims in issue reads directly on the McCullough method and apparatus. Said method and apparatus of McCullough accomplish the same result in substantially the same way as the Bender method and apparatus and are the full equivalent thereof. Each of the Bender claims 14, 15, 16, 19 and 20 has been infringed by McCullough each and every time it performed a natural gamma ray logging operation prior to the expiration of the Bender patent.

19.

The scintillation counter utilized in the McCullough natural gamma ray logging apparatus is a radiation responsive generator of impulses, is a member sensitive to radioactivity and is adapted to translate said radiations into electrical impulses with the number of said impulses corresponding to the number of said radiations to quantitatively measure the radioactive properties of the formations encountered at different depths inside the drill hole. Geiger counters, scintillation counters and ionization chambers are all radiation detectors sensitive to gamma rays, they all accomplish the same result in substantially the same manner, they all detect radiation by producing electrical signals indicative thereof, and it is a matter of choice as to which type of radiation detector is used in performing natural gamma ray logging operations. The resulting logs are substantially the same regardless of the type of detector used. The scintillation counter used by McCullough in its natural gamma ray logging operations, performs no different function from that performed by the Geiger counter of Bender, the modes of operation are the same and they are full equivalents in

said logging operations. None of the Bender claims in issue is limited to a Geiger counter or any specific type of radiation detector, nor is any such limitation demanded by the prior art or the proceedings in the Patent Office.

### 20.

Although a scintillation counter may be used to determine the energy spectrum of natural gamma rays, as with the McCullough Scintillation Spectrometer, McCullough Tool Company in its conventional natural gamma ray logging operations does not determine the energy spectrum of the natural gamma rays measured. The McCullough natural gamma ray log is a measure of the number per unit of time of gamma radiation that results from the natural disintegration of radioactive elements.

### 21.

No prior art relied upon by McCullough discloses or teaches the invention of any of the Bender claims in issue or negates the fact that John C. Bender was the first and original inventor of the invention described by said claims. Specifically, the Ambronn publication considered by the Patent Office and relied upon very heavily by McCullough at the trial, neither discloses nor teaches the use of a Geiger counter or any other type of radiation detector which produces an electrical signal; Ambronn discloses only the use of an electroscope, which provides an optical indication and is not suitable for use in radioactivity well logging. The invention covered by the Bender claims in issue comprised a new combination of elements and a new mode of operation that was not obvious to those skilled in the art at the time Bender filed his application.

### 22.

The application for reissue of the Bender patent was filed in the Patent Office less than two years after the issuance of the original Bender patent, and hence within the period during which application might then be made for a reissue patent enlarging the scope of the claims of the original patent. The specification of the Bender reissue is substantially identical with that of Bender's original patent, both of which contain a full and complete disclosure of natural gamma ray well logging and apparatus for performing the same.

### 23.

The subject matter of the Bender reissue claims in issue was explicity disclosed and taught but was not claimed in his original patent No. 2,133,776. The oath of Bender which accompanied the reissue application specifically stated that the reason for the reissue was to obtain claims directed to subject matter disclosed but not claimed in the original patent. The invention covered by said reissue claims in issue is the same invention as disclosed by the original patent as required by the Statute.

### 24.

The defenses against the Bender reissue patent of inoperability, lack of inadvertence, accident or mistake in filing the reissue, indefiniteness and unreasonable delay in filing the application for reissue are not supported by any probative evidence in this case.

### 25.

There is no evidence that Bender ever authorized or approved the cancellation of claims 7 and 8 from his original application or that said cancellation was agreed upon at any conference at which Bender or his then attorney was present or that by said cancellation said attorney intended to abandon subject matter subsequently covered by the Bender claims in issue. In his depositions, John C. Bender made no statement that can properly be interpreted as an admission that he did not invent natural gamma ray logging, or that claims 7 and 8 of his original application were cancelled with his approval, or that said cancellation was intended as an abandonment of his natural gamma ray logging invention. Mr. Bender has never disclaimed any of the subject matter of any of the claims of his reissue patent, but on the

contrary by his oaths in his original application and in his application for reissue, he specifically swore that he believed himself to be the original, first and sole inventor of natural radioactivity logging as claimed.

26.

The invention of the Bender patent is not the mere observation of a natural process or merely the use of an element found in nature. The Bender patent is not an attempt to claim or monopolize a natural phenomenon, nor is the only difference between the disclosure of the Bender patent and the prior art a natural phenomenon. The Bender patent teaches the lowering of a radiation detector and other apparatus into a well for producing and transmitting signals to the surface which are recorded in correlation with depth to produce a log of the lithology of the subsurface formations. Claims 14, 15, 19 and 20 describe a complete process of gamma ray logging, and claim 16 describes a complete apparatus for practicing that process.

27.

The methods and apparatus for natural gamma ray logging defined by the claims in issue of the Bender patent are *of great utility and value; they were* not obvious, but were the result of invention by the patentee; and they are not anticipated by, but displayed substantial inventive advance over, the prior art in evidence. In obtaining said patent, Bender *complied with all the laws* and rules then in force; the patent was duly and legally issued; and McCullough Tool Company has infringed the claims thereof in issue.

28.

The only source of primary radiation specifically disclosed by Bender in his application as originally filed was an X-ray tube. This taught that the primary radiations were X-rays. No one in the art of radioactivity well *logging* has commercially utilized an X-ray source of primary radiation.

29.

It was known prior to Bender's invention to utilize a Geiger-Muller counter and an amplifier to determine the radioactivity of substances in surface operations. In such surface operations said elements function in the same manner as in radioactivity well logging.

30.

Prior to the date of the original Bender Patent No. 2,133,776, scintillation counters were known to be the equivalent of Geiger counters as radiation detectors for the detection of gamma rays by converting incident gamma rays into corresponding electrical signals, which can then be measured as an indication of gamma ray intensity. This is shown by Johnston Patent No. 893,244 (WSI Ex. 18) and the work of Von Meyeren (McCullough Ex. 14) and RCA (WSI Ex. 19, T-2).

31.

Prior to the time Bender filed the application for his original Patent No. 2,133,776 and prior to Bender's making the application for reissue Patent No. 23,226, in suit, Bender had studied and was familiar with the publication "Elements of Geophysics" by Ambronn and translated by Cobb. (McCullough patent Exhibit 40.)

*Findings Directed Primarily to Fearon Patent No. 2,308,361*

32.

The application for Patent No. 2,308,361 hereinafter sometimes referred to as the Fearon '361 patent was filed by Robert Earl Fearon on November 10, 1938 and was issued to Well Surveys, Inc. on January 12, 1943. The claims of this patent are specifically directed to and cover neutron logging as herein defined. Claims 2 and 3 are in issue.

33.

While the Bender invention of natural gamma ray logging produced valuable information as to the types of forma-

tions in the bore hole, there still remained a pressing need in the oil industry for more information concerning said formations. In particular, there was an urgent need for a log which would complement the Bender natural gamma ray log and give an indication as to the porosity and possible oil content of the inaccessible subsurface formations. Fearon was the first to disclose and teach neutron logging which was pioneered by WSI and Lane-Wells and was introduced as a commercial service by 1942.

### 34.

Natural gamma ray logging is a passive type of logging in that it measures and utilizes something that exists because of its own natural action. Neutron logging, on the other hand, is an active type of logging in that it measures and utilizes the results of irradiating the formations with neutrons. The natural gamma ray log shows the presence of formations of a lithologic type which can contain oil. The neutron log tells whether or not a particular formation which could contain oil contains any fluid, although it does not tell whether that fluid be water or oil.

### 35.

While neutron logs and gamma ray logs are both obtained by a form of radioactivity well logging, they are quite dissimilar. The neutron log is a new and useful result never before obtained prior to the invention thereof by Robert E. Fearon as disclosed and claimed in the Fearon '361 patent.

### 36.

Each of the Fearon '361 claims in issue is limited to a method or apparatus for bombarding subsurface formations with neutrons and measuring *in situ* radiations emitted by the formations as a result of said bombardment, as distinguished from measuring gamma rays naturally emitted by said formations. This includes the measurement of whatever radiations return to the detector as a result of the neutron bombardment of the formations. Said claims in issue recite a new combination of elements and a new mode of operation.

### 37.

The McCullough neutron logging apparatus as shown on page 2A of WSI Exhibit No. 10 and WSI Exhibit No. 11 (A, C and D) contains each and every element of apparatus claim 3 of Fearon '361. Reference to said exhibits and the evidence shows that the method of neutron logging used by McCullough comprises bombarding subsurface formations with neutrons and measuring *in situ* radiations emitted by the formations as a result of said bombardment and thus includes each and every step recited in method claim 2. Each of the Fearon '361 claims in issue reads directly on the McCullough method and apparatus. Said method and apparatus of McCullough accomplish the same result in substantially the same way as the Fearon method and apparatus and are the full equivalent thereof. Each of the Fearon claims 2 and 3 has been infringed by McCullough each and every time it performed a neutron logging operation prior to the expiration of the Fearon '361 patent.

### 38.

The scintillation counter utilized in the McCullough neutron logging apparatus is a detector of radiations and is used to measure radiations from the formations as a result of neutron bombardment of the formations. Geiger counters, scintillation counters and ionization chambers are all detectors of radiation and each may be made sensitive to either gamma rays or neutrons. It is a matter of choice as to which type of detector is used in performing neutron logging of a particular species, i. e., neutron-gamma ray logging or neutron-neutron logging. The resulting logs are substantially the same regardless of whether the detector is a Geiger counter, scintillation counter or ionization chamber and are produced in substantially the same manner. The scintillation counter used by McCullough in its neutron log-

ging operations performs no different function from that performed by the ionization chamber of Fearon, the modes of operation are the same and they are full equivalents in said logging operations. None of the Fearon '361 claims in issue is limited to an ionization chamber or to any specific type of radiation detector, nor is any such limitation demanded by the prior art or by the proceedings in the Patent Office.

39.

Although a scintillation counter may be used to determine the energy spectrum of radiations resulting from neutron bombardment, as with the McCullough Scintillation Spectrometer, McCullough Tool Company in its conventional neutron logging operations does not determine the energy spectrum of the radiations measured. The McCullough neutron log is a measure of the number per unit of time of returning fast neutrons.

40.

Prior to the invention of the Fearon '361 patent, it had never been known or suggested to bombard the formations of a bore hole with neutrons and measure the resulting radiation. The Fearon '361 patent fully discloses this process, including the detection of either neutrons or gamma rays, or both, impinging on the subsurface tool. The invention disclosed and claimed in the Fearon '361 patent produced a new and beneficial result never before attained. Neutron logging as disclosed and claimed in the Fearon patent '361 was the first practical and the first commercial use of a neutron source.

41.

The substitution by Fearon of a neutron emitting source for the gamma ray emitting source or the X-ray emitting source disclosed in the Bender patent was not obvious to those skilled in the art and amounts to invention.

42.

The invention of the Fearon '361 patent is not the mere observation of a nat-ural process or merely the use of an element found in nature. The Fearon '361 patent is not an attempt to claim or to monopolize a natural phenomenon, nor is the only difference between the disclosure of the said Fearon patent and that of the Bender patent a natural phenomenon. The Fearon '361 patent teaches the lowering of a source of neutrons into a well and apparatus for utilizing the neutrons so produced to bombard the formation surrounding the well and for measuring radiation passing from the formation to the subsurface tool as a result thereof. Claim 2 of Fearon '361 describes a complete process of neutron logging, and Claim 3 describes a complete apparatus for practicing that process. Neither was obvious to those skilled in the art at the time Fearon filed the application for his '361 patent.

43.

The methods and apparatus for neutron logging defined by the claims in issue of the Feron '361 patent are of great utility and value; they were not obvious, but were the result of invention by the patentee; and they are not anticipated by, but displayed substantial inventive advance over, the prior art in evidence. In obtaining said patent, Fearon complied with all the laws and rules then in force; the patent was duly and legally issued; and McCullough Tool Company has infringed the claims thereof in issue.

44.

The invention of the Fearon patent was made subsequent to the invention of Bender as set forth in the Reissue Patent No. 23,226. Neutron sources *per se* were known prior to the invention of the Fearon '361 patent.

*Findings Directed Primarily to*
*Fearon Patent No. 2,390,433*

45.

The application for Patent No. 2,390,433 was filed by Robert Earl Fearon on March 25, 1940 and issued to Well

Surveys, Inc. on December 4, 1945. This patent is hereinafter sometimes referred to as the Fearon '433 patent. Claims 1, 4, 5, 10 and 13 are in issue.

### 46.

The Fearon '433 patent discloses and teaches methods and apparatus for simultaneously but separately measuring with a single logging tool both gamma rays and neutrons impinging upon the tool from the formations surrounding the well bore. The claims in issue cover methods and apparatus for the simultaneous recording, on a single chart in correlation with depth, of both a natural gamma ray log as disclosed and claimed in the Bender Reissue Patent No. 23,226 and a neutron-neutron log as disclosed and claimed in Fearon Patent No. 2,308,-361. This system of logging is referred to in the trade as dual logging or simultaneous logging.

### 47.

When gamma ray and neutron logs are run separately, errors in depth measurements make inaccurate correlation of the logs with each other. Accuracy of such correlation is achieved by making both logs simultaneously with the respective radiation detectors spaced a fixed distance apart in the same logging tool, even though there may be errors in the depth measurements. This result was not known before the invention disclosed and claimed in Fearon '433.

### 48.

The McCullough dual logging apparatus as illustrated on page 3A of WSI Exhibit No. 10 and WSI Exhibit No. 11 (A, C and D) comprises a single tool containing a neutron source, a gamma ray detector and a neutron detector all in spaced relation, and circuitry for sending the respective signals up the cable to produce separate but correlated gamma ray and neutron logs on the same chart. The McCullough detectors are not differentially shielded. Although differing in the particular detectors used, the Fearon and McCullough tools accomplish the same beneficial result.

### 49.

If valid, apparatus claims 4 and 5 of the Fearon '433 patent are literally infringed by the McCullough apparatus since it contains each and every element of these claims arranged in the same manner to do the same work and achieve the same result. Claims 4 and 5 are not limited to any particular spacing between the detectors nor to any particular circuitry. If valid, method claims 1, 10 and 13 are also infringed by McCullough, since in the use of its apparatus shown on page 3A of WSI Exhibit No. 10 and in WSI Exhibit No. 11 (A, C and D), the McCullough method includes each and every step of said claims. By having its two radiation detectors spaced only about six feet apart in the same subsurface tool, the McCullough system separately measures the natural gamma rays and neutrons simultaneously at substantially the same level in the well.

### 50.

The Fearon '433 patent was the first to disclose and claim methods and apparatus for simultaneously and separately performing gamma ray and neutron logging with the same tool. No prior patents or publications have been urged by McCullough against this patent other than those which were considered by the Patent Office. None of said patents or publications anticipates any of the claims in suit of the Fearon '433 patent.

### 51.

In addition to the broad showing of simultaneous logging, the Fearon '433 patent discloses particular radiation detectors (differentially shielded ionization chambers) and means for electrically combining the outputs of the separate radiation detectors to effect more accurate measurements of gamma rays and neutrons. These elements are recited in some of the claims of the Fearon '433 patent not here in issue, but none of the claims in issue is so limited. There is nothing in the file wrapper of the '433 patent to indicate that either Fearon or the Examiner considered any particular

type of radiation detector, or combining means, or the mathematical equations disclosed in the specification to be an essential feature of the invention. Allowance of the claims in issue was not based on any such limitations, and none of said claims is so limited.

## 52.

While the methods and apparatus defined by the claims in issue of the Fearon '433 patent have been a commercial success in producing a different and more desirable result in making a neutron log and a gamma ray log simultaneously, said logs being correlated with depth and with each other and therefore reducing the probability of error, nevertheless this does not represent invention in the light of the prior art, for such a combination of two separate radiation detectors in the same subsurface tool was obvious to those skilled in the art at the time of the Fearon '433 application. No invention was or could be involved in merely combining in axially spaced relation in one tool a natural gamma ray logging radiation detector as taught by the Bender Patent No. Re. 23,226 and a neutron logging radiation detector as taught by Fearon's earlier Patent No. 2,308,361 and transmitting the signals from said detectors to the surface over the same cable to be simultaneously recorded on a single chart. Fearon being then an employee of WSI was obviously skilled in the art and fully conversant with both gamma ray and neutron logging equipment and with the obvious necessity of preventing interference of one measurement with the other.

*Findings Directed Primarily to Swift Patent No. 2,554,844*

## 53.

The application for Patent No. 2,554,844 hereinafter referred to as the Swift Patent, was filed by Lawrence M. Swift on March 22, 1946 and issued to Well Surveys, Inc. on May 29, 1951. Claims 1 to 6 inclusive are in issue.

## 54.

Since radioactivity well logs are measurements of radiation as a function of depth, the depth measurement is just as important as the radiation measurement. If any section of the radioactivity well log is not a faithful record of the radiation measurement with respect to the depth thereof, at least that section of the log is useless.

## 55.

Almost from the start of the radioactivity well logging industry and certainly as soon as deep holes were being logged, the industry was plagued with the problem of accuracy of depth measurements due to unpredictable cable stretch, intermittent binding of the logging instrument in the well bore and other causes. This problem was first solved for cased wells by the invention of the Swift patent which met with immediate and substantial commercial success.

## 56.

The Swift patent discloses and claims apparatus for identifying and locating formations penetrated by a cased well bore by measuring a physical property of said formations with respect to permanent markers located along the well bore. Means are provided for obtaining indications (signals) of the passage of an exploring tool past the casing collars simultaneously with obtaining signals upon measurement of radiation from the formations, combining said signals and transmitting them together to the surface, and simultaneously recording said signals to provide a log in which the radiation measurements are accurately correlated with depth by the casing collar record. The casing collar indications or signals are primary depth measurements made at the time and place of the radiation measurements, said measurements being tied together at the place of measurement by combination of the separate signals. The use of these primary depth measurements produces a log which is essentially different from a radiation log wherein depths are determined by second-

ary measurements made at the surface, as by a measuring wheel, far from the place in the well where the radiation measurements are made.

### 57.

The Swift patent is concerned with utilizing the casing collars which are permanently fixed in a cased well as bench marks, making radiation measurements relative to the positions of these bench marks, and recording the radiation measurements and the indications of the bench marks simultaneously to provide a radioactivity well log in which the radiation measurements are accurately recorded as a function of depth as indicated by the casing collar indications. This is a new combination of elements which produces a new and useful result. The elements cooperate to produce a unitary result and are not a mere aggregation as urged by McCullough.

### 58.

Two embodiments of the Swift invention are described in the specification. One of these embodiments uses a one pen recorder as illustrated in the patent drawing and on page 4 of WSI Exhibit No. 10. This embodiment was never used commercially by WSI or Lane-Wells. The second embodiment of the Swift invention uses a two pen recorder, as illustrated on page 5 of WSI Exhibit No. 10. This second embodiment was used by Well Surveys and Lane-Wells for many years. None of the claims of the Swift patent is restricted either to a one pen recorder or to a two pen recorder; the term "a recorder", as used in the claims, includes both a one pen recorder and a two pen recorder.

### 59.

The Swift patent discloses a combination of a casing collar locator with a radiation detection system in which the casing collar signal and the radiation signal are electrically associated so that when the casing collar signal is imposed upon the radiation detection circuit, the radiation signal is interrupted. This interruption system is an illustration of but one of several available means for transmitting the casing collar signal and the radiation signal over the same cable, and none of the claims of the Swift patent is limited to this system. Original claim 7 of the application as filed was so limited, but was cancelled during prosecution of the application, thereby indicating that this particular means was not deemed critical either by Swift or by the Patent Office. There is nothing in the file wrapper that requires any of the claims to be so limited.

### 60.

In the Swift invention, the casing collars are located by magnetic means responsive to changes in the magnetic flux path caused by the casing collars to produce the casing collar indication or signal. Radiation from the formations is detected by a radiation detector to produce the radiation signal. A common transmission system is used for transmitting the casing collar signals and the radiation signals to the surface recording equipment. None of the claims of the Swift patent is limited to any particular type of magnetic collar locating means or radiation detector, nor is there any indication in the Swift file wrapper that such specific means or detector was a necessary part of the invention.

### 61.

The McCullough Catalog, pages 3280 and 3297, WSI Exhibit No. 12–I, the McCullough drawings, WSI Exhibit 11(A, C and D), as well as a comparison of pages 4 and 4A and pages 5 and 5A of WSI Exhibit No. 10, show that both structurally and functionally the McCullough logging apparatus with casing collar locator is substantially the same as that shown in the Swift patent. The McCullough apparatus consists of a subsurface instrument containing a scintillation counter which independently produces signals proportionally related to the radiation from the formations, a magnetic casing collar locator which independently produces indications or signals

indicative of the proximity of casing collars, a subsurface amplifier into which both of said signals are fed, the casing collar signal being applied to the last stage of said amplifier thereby superimposing the collar signal on the radiation signal and thereby combining the signals, the combined signals being introduced from the amplifier into the transmission system and transmitted over the same conductor to the surface where they are recorded by the same recorder using separate pens. Each and every element of claims 1 through 6 of the Swift patent is employed in the McCullough apparatus in the same way as disclosed by Swift to achieve the same result. Each of the Swift claims in issue reads directly upon the McCullough apparatus and has been infringed by McCullough each and every time it performed radioactivity well logging involving the location of casing collars after the Swift patent issued. Casing collars are automatically recorded with any McCullough radiation log run inside casing.

62.

The prior art, and particularly the Ennis patent does not anticipate Swift. The new combination of elements forming the Swift invention and their new mode of operation were not obvious to those skilled in the art at the time the Swift application was filed.   .

63.

Magnetic casing collar locators and radioactivity well logging systems were separately known long prior to the invention of the Swift patent. It was also old long prior to the invention of the Swift patent to transmit multiple signals over a common conductor.

64.

The well logging apparatus with casing collar locator defined by the claims in issue of the Swift patent is of great utility and value; it was not obvious, but was the result of invention by the patentee; and it is not anticipated by, but displayed substantial inventive advance over, the prior art in evidence. In obtaining said

patent, Swift complied with all the laws and rules then in force; the patent was duly and legally issued; and McCullough Tool Company has infringed the claims thereof in issue.

65.

In the McCullough system utilizing a casing collar locator and a radiation detecting instrument, the casing collar signal does not cause an interruption of the radiation signal.

*Findings Directed Primarily to Fearon Patent No. Re. 24,226*

66.

The Fearon reissue patent No. 24,226 is a mere paper patent having found no application in use at any time.

67.

No one ever commercially operated the apparatus as shown and described in the Fearon reissue patent No. 24,226.

68.

Well Surveys, Incorporated, and the patentee Fearon made no use of the apparatus of Fearon reissue patent No. 24,226.

69.

Neither form of apparatus shown in the Fearon reissue patent No. 24,226, i. e., that disclosed in Figure 1 and Figure 8, has ever been operated prior to the institution of this action.

70.

The claims in suit are claims 5, 6, 9, 10 and 11.

71.

Claims 5 and 6 which are original claims of patent No. 2,351,028 must be construed to cover exactly what is shown in the reissue patent No. 24,226, and as thus construed have not been infringed by the McCullough Tool Company.

72.

The reissued claims 9, 10 and 11 of reissue Patent No. 24,226 are void because of unreasonable delay for a period of

388

twelve (12) years in making application for the reissue.

73.

The specification and claims of the original patent No. 2,351,028 did not set forth or describe the use of a "single unit crystal".

*Findings Directed Primarily to Pringle et al. Patent No. 2,686,266*

74.

█ On August 10, 1954 United States Letters Patent No. 2,686,266 was issued to plaintiffs, Robert W. Pringle, Kenneth I. Roulston and George M. Brownell for an invention in improvements in radiation detectors and since that date said Robert W. Pringle, Kenneth I. Roulston and George M. Brownell have been and still are the owners of said Letters Patent No. 2,686,266, subject to an exclusive license to make, use and sell the invention of said Letters Patent granted to the plaintiff, McCullough Tool Company. Claims 1, 2, 5–10, 13, 14, 20–23 are in issue.

75.

Claim 23 of the Pringle et al. Patent No. 2,686,266 is limited to a detector of neutrons and means for measuring their energies and intensities by virtue of proton recoil resulting from the impingement of fast neutrons upon a scintillation phosphor. Neither Well Surveys, Inc. nor Dresser Industries, Inc. has ever used in any commercial operation a phosphor which scintillates in response to fast neutron bombardment by virtue of proton recoil. Neither Well Surveys, Inc. nor Dresser Industries, Inc. has infringed claim 23 of the Pringle et al. Patent No. 2,686,266.

76.

Gamma rays emitted by formations, whether naturally or as a result of neutron bombardment, have energies (wave lengths) characteristic of the elements making up the formation. The relative intensities of gamma rays of various energies coming from a given formation is therefore determined by the relative abundance of the various elements contained in that formation. By selectively measuring the intensities of gamma rays of energies characteristic of particular elements, the abundance of those particular elements contained in the formation is ascertained.

77.

Claims 1, 2, 5 to 10, 13, 14, 20 to 22 of the Pringle et al. patent are limited to scintillation counter apparatus for the determination of energy charactristics of gamma rays by analyzing the pulses generated by the gamma rays to determine energy characteristics either by variation of an integral discriminator setting or by use of a differential discriminator.

78.

Claims 1, 2, 5 to 10, 13, 14 and 20 to 22 of the Pringle et al. patent, when limited as set forth in Finding 77, are valid.

79.

Crystal size is not critical to the invention claimed in the claims in issue of the Pringle, et al. patent.

80.

An integral discriminator with a single fixed level of discrimination cannot be used to measure energy characteristics except to the limited extent which is involved in excluding pulses of amplitude less than the fixed level and receiving and counting pulses of amplitude above the preselected level. This is not a measurement of energy characteristics as the term is used and defined in the Pringle patent.

81.

A fixed integral discriminator used with a scintillation counter including a crystal having a mass of at least 10 grams does not infringe any of the claims in issue of the Pringle patent. Infringement requires a differential discriminator or an integral discriminator with its discrimination level varied.

## 82.

Well Surveys, Incorporated and/or Dresser Industries, Inc. (substituted for Lane-Wells Company) in the Northern District of Oklahoma and elsewhere in the United States, have made, used and/or operated within the period of six (6) years prior to the filing of the Complaints herein, and are still utilizing and operating radioactivity well logging equipment employing a subsurface instrument which includes a scintillation counter as the detector of radiations which counter includes a single unit crystal sensitive to gamma rays and having a mass of at least ten grams. Said crystal is optically coupled to a photomultiplier tube and is housed within a light-tight, moisture-proof container in which the crystal is surrounded by reflecting powder whereby the container protects the crystal from moisture deterioration and the powder reflects scintillations produced in the crystal so that they may reach the photomultiplier tube. The mass of the crystal is such that the energies of gamma rays impinging thereon are converted within the crystal to scintillations. The crystal is transparent to its own scintillations, and its thickness is greater than the range of secondary particles produced by the majority of the gamma rays in the crystal. The crystal and photomultiplier tube are utilized in combination with a pulse amplifier, a threshold circuit (i. e., an integral discriminator), a scaler, and a pulse shaper.

## 83.

The various radioactivity well logging apparatus of Well Surveys, Inc. are shown and described in McCullough Exhibit No. 22. The only apparatus alleged to be infringing are those utilizing scintillation counters, i. e., Series 311, 312, 400, 401, 402 and 403. These are described in the written descriptions of Exhibit 22 identified by these series numbers and are illustrated in the drawings of Exhibit 22 identified as WM1–C, WM2–A, WM3–A, WM4–A, WM5–A, WM6–A, WM7–A, S2816–A and S3211–

A. The WSI scintillation counter apparatus is further generally illustrated and described in McCullough Exhibit No. 51A. Lane-Wells Company (Dresser Industries, Inc.) has utilized modifications of at least some of the Series 311, 401 and 402 scintillation counter apparatus in performing the Chlorinilog and Cemoton operations illustrated and described in McCullough Exhibits 51B1, 51B2, 51C, 51D and 51E.

## 84.

A scintillation counter type of gamma ray detector produces individual electrical pulses of sizes proportional to the energies of the respective individual gamma rays detected. In radioactivity well logging the scintillation counter is utilized in conjunction with a discriminator that passes only those electrical pulses of sizes greater than its discrimination level, i. e., an integral discriminator. The discriminator may be set at any desired level of discrimination. Scintillation counters may be used as the radiation detector in making conventional gamma ray logs and neutron logs and, by appropriate modifications, can also be used to make spectral logs. In conventional natural gamma ray, neutron-gamma ray, or gamma-gamma logging as performed by the parties with scintillation counters, the discriminator is maintained at a single fixed level to eliminate pulses from noise and low energy gamma rays during the entire measurement.

## 85.

McCullough has not sustained its burden of proof in showing that any claim in issue of the Pringle patent (claims 1, 2, 5–10, 13 and 20–23) is infringed by any scintillation counter instrument of Well Surveys, Inc. except as used in making that form of Chlorinilog run by Dresser Industries, Inc. which comprises a conventional neutron-gamma ray log made with a scintillation counter at a given discrimination level and a second neutron-gamma ray log made with the scintillation counter at a different discrimination level.

**86.**

The claims in issue of the Pringle patent, if valid, are limited to spectral measurements, and as applied to radioactivity well logging the claims in issue (except claim 23), if valid, are limited to spectral logging where gamma ray energies are measured. They are not infringed by conventional radioactivity well logging as performed by Well Surveys, Inc. and/or Dresser Industries, such as gamma ray and neutron logging, whether or not scintillation counters are used.

**87.**

The Cemoton log is a gamma ray-gamma log run by Dresser Industries, Inc. and is used to locate the top of cement in a well.

**88.**

The Chlorinilog is a log run by Dresser Industries, Inc. to determine the relative presence of chlorine. The Chlorinilog is essentially a comparison of two neutron logs differently responsive to the relative presence of chlorine. When the two logs are plotted side by side, any divergence is indicative of chlorine.

**89.**

Well Surveys, Inc. and/or Dresser Industries, Inc. has run logs with Series 311, 312, 400, 401, 402 and 403 instruments where a single fixed discrimination level was used and the intensity of all gamma rays above the discrimination level was measured. Such operations were not spectral logging and did not infringe any of the Pringle claims in issue.

**90.**

The invention of the Pringle et al. Patent No. 2,686,266 was not introduced, imported or made known by Pringle et al. within the United States prior to November 10, 1949, the date when the corresponding Canadian patent application was filed. The earliest effective invention date for the Pringle et al. patent is therefore November 10, 1949.

*Findings Directed Primarily to Martin et al. Patent No. 2,686,268*

**91.**

On August 10, 1954, United States Letters Patent No. 2,686,268 was issued to plaintiffs Philip W. Martin and Robert W. Pringle for a well logging device and since that date plaintiffs Philip W. Martin and Robert W. Pringle have been and still are the owners of said Letters Patent subject to the exclusive license granted to McCullough Tool Company to make, use and sell devices embodying the invention of said Letters Patent. Claims 1, 2, 3, 6, 8, 15–18 are in issue.

**92.**

In the operation of a scintillation detector system of well logging a problem existed in maintaining the scintillation detector system under a relatively stable condition of temperature throughout the varying high temperature conditions existing in a well.

**93.**

The Martin, et al. system of temperature control stabilized the scintillation detector whereby the same will operate to log wells at temperatures in excess of 350° F.

**94.**

In oil well logging using a scintillation detector system of radiation detection it is important to the operation that the temperature of the scintillation detector be controlled at a relatively stable temperature throughout the operation.

**95.**

The claimed invention of the Martin, et al. Patent No. 2,686,268 has had wide commercial success.

**96.**

The scintillation detector system for oil well logging utilized by defendants, Well Surveys, Incorporated and Lane-Wells Company (Dresser Industries, Inc.) incorporates the same or equivalent elements having substantially the same

mode of operation and produces substantially the same results as the device defined by claims 1, 2, 3, 6, 8 and 15 to 18, inclusive, of the Martin, et al. Patent No. 2,686,268, and would constitute an infringement of said claims if they were valid.

### 97.

A device similar to the apparatus disclosed by the Martin, et al. Patent No. 2,686,268 was first successfully operated in the stabilization of the temperature by radiation detector system in oil well logging in the well of the Union Oil Company out of Los Angeles, California in August 1950.

### 98.

The Martin, et al. Patent No. 2,686,268 as to claims 1, 2, 3, 6, 8 and 15 to 18, inclusive, is invalid in view of the patent to Miller No. 2,324,103 granted July 13, 1943; the Jackson Patent No. 2,521,294 granted September 5, 1950, and the publication by Louis Wouters entitled, "Solid Counters: Scintillation Counters", W.S.I. Patent Exhibit 19, T–62.

*Findings Directed to the Defense of Misuse*

### 101.

 Well Surveys, Incorporated, hereinafter called WSI, was incorporated on May 4, 1939. It engaged immediately in research and development of various methods for the logging of oil wells by the detection and reading of radioactivity manifested by strata of the earth penetrated by a bore hole, including both natural emanations and those artificially induced by the logging apparatus. It designed, manufactured, used and sold apparatus for execution of oil well logs by radioactivity readings, and conducted research and experimentation in this field as well as others. This general activity continues to the date of these findings, except that WSI does not execute oil well surveys for others for hire.

At the date of its organization one-half of the stock of WSI was issued to and held by Socony-Vacuum Oil Company, which paid therefor the sum of $100,000.00, and the remainder of its stock was held by Engineering Laboratories, Inc., a corporation, and various individuals, among whom were inventors who had contributed certain patent applications, inventions, research data and apparatus to the enterprise. The stock of WSI was held in this fashion until the winter of 1950–1951, except that Engineering Laboratories, Inc., had disposed of its stock to individuals.

In the winter of 1950–1951 Lane-Wells Company, which was then a licensee of WSI, acquired one-half the stock of WSI from owners thereof other than Socony-Vacuum Oil Company. From the date of this acquisition until a date in 1954, the stock of WSI was held one-half by Socony-Vacuum and one-half by Lane-Wells.

In 1954 Socony-Vacuum Oil Company sold its one-half of the stock of WSI to Lane-Wells Company, which then became the owner of all of the capital stock of WSI.

In the year 1955 Dresser Industries, Inc., became the owner of all of the stock of Lane-Wells Company and of WSI. On April 30, 1958, Dresser Industries, Inc., liquidated Lane-Wells Company. Since 1955 Dresser Industries, Inc., has been the sole stockholder of WSI. Since April 30, 1958 Dresser Industries, Inc., has provided through its Lane-Wells division the radioactivity well logging services formerly provided by Lane-Wells Company.

### 102.

At the date of its first contract with WSI, June 11, 1940, and until its liquidation in 1958, Lane-Wells Company was engaged in the business of oil well servicing for hire, rendering various completion services to drillers and operators of oil and gas wells, including logs and surveys of various types, perforating, and from shortly after June 11, 1940, radioactivity well logs. At the time of the first contracting of Lane-Wells with WSI, Lane-Wells was the owner of the Bender patent in suit relating to well logging by

radioactivity readings, but conducted no research in the field, did not manufacture apparatus for radioactivity surveys, and held no patents relating to radioactivity well surveying other than the said Bender patent. The business of Lane-Wells consisted of the rendition of well completion services for others for hire.

### 103.

At the date of first contracting between WSI and Lane-Wells Company, WSI held a number of patents and patent applications relating to radioactivity well surveying, was conducting research and development work relating thereto, and was engaged in the design and manufacture of apparatus for executing well surveys by means of radioactivity readings. Its said patents and patent applications related both to methods for the accomplishment of such readings and to apparatus for the execution of the same.

### 104.

On June 11, 1940 WSI and Lane-Wells Company entered into a contract whereby WSI licensed Lane-Wells Company under its patents to practice radioactivity well surveying for others for hire. The license so granted was exclusive to Lane-Wells Company except for two limited non-exclusive grants previously given to Socony-Vacuum Oil Company, Inc., and Engineering Laboratories, Inc., and except for a reserved right in WSI to practice the said methods for its own account. A condition of this agreement required Lane-Wells to purchase from WSI all detecting and recording instruments for rendering radioactivity well logging services, including those used in the exercise of the licensed right, together with all equipment and materials having directly to do with radioactivity measurements, as distinguished from accessory equipment such as trucks, winch and cable. A further condition of this agreement was a covenant by Lane-Wells that it would not, during the contract term, engage intentionally in research and development work in radioactivity well logging, but that Lane-Wells would leave such research to WSI, which agreed to and did in fact continue it.

The term of the contract of June 11, 1940 was initially stated to extend to December 31, 1950, and from year to year thereafter unless terminated by notice. By an agreement dated January 1, 1948 the term of this contract was extended to December 31, 1960, with like provisions for extension absent notice of termination. The said agreement was actually terminated on April 16, 1951, by the terms of a new agreement.

### 105.

By the agreement of June 11, 1940, Lane-Wells granted WSI a license exclusive except for Lane-Wells itself, under the Bender patent. Such patent was reissued after June 11, 1940, and expired in October of 1955. On April 12, 1956 the right to sue for past infringement of the Bender patent was assigned by Lane-Wells to WSI.

### 106.

On March 3, 1942 WSI made an additional agreement with Lane-Wells Company whereby a means or method for radioactivity well logging by employment of neutrons, together with other improvements in apparatus were licensed exclusively to Lane-Wells Company (with the same exceptions indicated in (104) above) for the practice of radioactivity well surveying for others for hire. A condition of the license granted by this contract was that Lane-Wells Company should purchase all detecting and recording instruments utilized in rendering radioactivity well logging services from WSI. A further condition of this license was a covenant by Lane-Wells not to engage in research and development work in neutron-gamma ray well logging, but to leave such research to WSI, which agreed to and did in fact continue it.

The term of this agreement was originally stated to expire on December 31, 1950. By a contract dated January 1, 1948 the term was extended to December 31, 1960, thereafter to extend from year

to year unless terminated by notice. This contract was likewise actually terminated by the agreement between the same parties dated April 16, 1951.

#### 107.

On July 30, 1945 WSI made another contract with Lane-Wells Company whereby the latter was licensed exclusively (with the same exceptions indicated in (104) above) under WSI patents to practice a means or method for locating casing collars in radioactivity well surveys made for others for hire. This contract was conditioned that Lane-Wells should purchase all detecting and recording instruments utilized in practicing the licensed method from WSI. The term of this license was extended in the same manner and for the same period and was terminated by the same agreement which ended the two preceding contracts between the same parties.

#### 108.

The methods, inventions and apparatus covered by the Bender reissue patent No. 23,226, the Fearon neutron patent No. 2,308,361, the Fearon dual logging patent No. 2,390,433, and the Swift patent No. 2,554,844, all of which are in suit upon claim of infringement, were licensed to Lane-Wells Company under the grants and during the effective periods of the three license agreements described in the preceding findings, and one or more of the said patents were practiced by the said licensee under the terms of each of the said agreements.

#### 109.

During the effective periods of the agreements of June 11, 1940, March 3, 1942, and July 30, 1945 Lane-Wells did purchase all detecting and recording instruments employed in practicing the licensed methods from WSI, and did in fact refrain from conducting research in accordance with such agreements.

#### 110.

On April 16, 1951 WSI made another contract with Lane-Wells Company. Under the terms of this agreement Lane-Wells Company surrendered its exclusive license under the three preceding agreements, and the said earlier agreements were terminated. By the new agreement Lane-Wells received a non-exclusive license under all of the WSI patents, including those in suit, and agreed that WSI might license third parties to the practice of radioactivity well surveying, under its own patents and the Lane-Wells Bender patent, but only upon terms stated in the new WSI-Lane-Wells contract. It was a condition of this agreement that WSI should not license third parties except in one of the alternative forms and upon the terms stated in the agreement of April 16, 1951, except with the consent of Lane-Wells. Such terms required such licenses to be granted only under all of the WSI patents and at royalty rates fixed by the agreement. The two alternative forms of license for extension to third parties were denominated respectively as "Immunity" and "Research-Service and License" agreements, and the precise forms thereof were as set forth in Exhibits A and B to the agreement of April 16, 1951. Under the terms of the 1951 agreement WSI was not free to license less than the whole of its patent package to any third party, and was not free to negotiate royalty rates less than those stated in its agreement with Lane-Wells, except with consent of Lane-Wells. Under the terms of this agreement no license to manufacture or procure instruments for practice of the licensed methods was granted to Lane-Wells and none was permitted to be granted to research and service licensees, with the effects found in finding (114). The royalty base of licenses permitted to be made by WSI to third parties was required to extend to all radioactivity well surveying whether or not accomplished by a licensed means or method, except as Lane-Wells otherwise consented.

The agreement of April 16, 1951 was stated to continue in force until December 31, 1960 and from year to year thereafter until terminated by notice; but the same was in fact terminated by a

subsequent agreement between WSI and Lane-Wells Company dated June 1, 1956.

### 111.

The 1951 agreement was a substantial change from the 1940, 1942 and 1945 agreements. The 1951 agreement did not restrict Lane-Wells from research in radioactivity well logging, nor did it expressly provide that Lane-Wells should buy its detecting and recording instruments from WSI.

### 112.

Each of the patents in suit was in fact licensed to Lane-Wells and others pursuant to the provisions of the contract of April 16, 1951, or by standard license agreements made pursuant to its authority, and each of the said licensees practiced one or more of the patents licensed under the said agreements.

### 113.

Immunity licenses and research and service licenses were granted to third parties by WSI under and pursuant to the agreement of April 16, 1951 and in the forms and upon the terms required by the said agreement. Except as permitted by the express consent of Lane-Wells Company, which was given in certain instances, and until June 1, 1956, WSI granted no licenses to any licensee except under all of its patents and at the royalties stipulated in its contract with Lane-Wells. Until June 1, 1956 licensees were obliged to accept license under all or none of the WSI patents except as special consent was obtained from Lane-Wells.

### 114.

The practical effect of the research and service license agreements issued pursuant to and in the form required by the contract of April 16, 1951, was to require such licensees to purchase apparatus from WSI for the practice of the means and methods licensed under such agreements. While no express covenant to buy instruments from WSI was exacted in the said research and service license agreements, the form and manner of contracting left such licensees no alternative but to buy required apparatus from WSI.

### 115.

By its refusal pursuant to contract, to license otherwise than under the alternative package licenses exhibited to the agreement of April 16, 1951, except with consent of Lane-Wells, WSI coerced the acceptance of license under the whole of its patents by prospective licensees. The alternative of seeking different terms at the consent of Lane-Wells Company did not adequately alleviate the coercion exerted upon the license prospect. This coercion continued and existed until the termination of the 1951 agreement on June 1, 1956.

### 116.

At and for some time following April 16, 1951 WSI was dominant in the market for the sale of instruments suitable to execute well logs by radioactivity readings. WSI refused to sell its well logging apparatus except to holders of its research and service license agreement. At the time licenses under the WSI patents were first offered to traders other than Lane-Wells, WSI utilized its refusal to sell instruments to induce acceptance by licensees of its research and service license agreement, covering the whole of its patent rights, at an enhanced royalty rate. At June 1, 1956, WSI no longer dominated instrument and apparatus supply for practice of radioactivity well logging, and after that date its refusal to sell its apparatus was not a compelling factor in its license contracting.

### 117.

Following June 1, 1956 WSI was not dominant in the market for the sale of instruments and apparatus for radioactivity well surveying. After the said date the refusal of WSI to sell its apparatus to others than its research and service licensees was reasonable and did not tend to eliminate competition and did not have an anti-competitive effect.

### 118.

After June 1, 1956, if the availability of WSI apparatus was an inducement

to prospective licensees to accept the research and service license at the 15 per cent royalty, the inducement was not rested upon a patent or patents, but was rested upon the reputation of the apparatus, the readiness of WSI manufacturing facilities to produce instruments, WSI's services and the benefits of continuous research.

### 119.

In spring of 1956, WSI effected a decisive change in its patent licensing policy. Pursuant to this change in policy it terminated its agreement with Lane-Wells dated April 16, 1951, it amended its standard forms of license agreement to permit research and service licensees to manufacture or procure instrumentation elsewhere than from WSI, it published notice advising the public that it was prepared to license any or all of its patents on reasonable terms, it wrote letters to all of its existing licensees offering termination of existing agreements and the negotiation of new agreements on reasonable terms, and by such actions accomplished a complete purge of previously existing patent abuses as of June 1, 1956. It also made a new agreement with Lane-Wells which contained no provision limiting the right of WSI to license others or requiring the consent of Lane-Wells to any such license.

### 120.

After June 1, 1956, WSI has been willing to grant licenses under its patents individually or collectively upon negotiated reasonable terms. While after June 1, 1956, prospective licensees were urged to accept license under one of the package forms of license, this was done as a matter of salesmanship upon the theory that the package would best serve the needs of the licensee. There was no coercion of licensees contracting subsequent to June 1, 1956 to accept license under all of the WSI patents unwillingly.

### 121.

In the circumstances of this case the provision of WSI research-service and license agreements requiring licensees to grant back nonexclusive licenses under new inventions in the field of radioactivity well logging, with permission to WSI to sublicense such new inventions to its licensees did not have an anti-competitive effect, but tended to bring about a wider distribution of the use of new inventions.

### 122.

While the royalty base employed in the standard license agreements made by WSI after June 1, 1956 included or purported to include operations covered by the expired Bender patent, the extension of the royalty base to cover practice of expired patents was not coerced, after June 1, 1956, but was voluntary upon the part of the licensees, who were offered a real alternative by WSI's offer to grant a license under any individual patent or patents upon negotiated terms.

### 123.

The contracts and agreements, including amendments and terminations thereof which are included as items numbered 1 through 51 in the two Books of Contracts stipulated in the record by the parties, and likewise the certain contract which is marked as McCullough Misuse Exhibit 507–G, are found to have been made by the parties who purported to execute the same.

### 124.

The provision of WSI's standard form agreements with regard to termination or extension of the license on a sale by the licensee of the instruments did not forbid the licensee to sell the instruments, but were appropriate provisions to protect WSI's rights on termination.

### 125.

No evidence was presented to sustain the charge that WSI or Lane-Wells intended by their contracting to fix prices of well logging services to third parties, or that their contracting had such effect.

### 126.

From April 16, 1951 until September 29, 1958 WSI refused to sell its radioactivity well logging apparatus to any-

one except to its research service licensees. At and after September 29, 1958, WSI offered to make its said apparatus available also to holders of its revised immunity license which was also a package license, including all unexpired WSI radioactivity well logging patents applied for prior to January 1, 1958.

### 127.

WSI has continued to the date of this finding to grant licenses in which the royalty base is all of the licensee's receipts from radioactivity well logging operations, including those covered by the expired Bender and Fearon neutron patents, except where the licensee has accepted WSI's offer to grant a license on an individual patent basis or on some other narrower basis. WSI continues to the date of this finding to receive royalty payments from one or more of its licensees calculated on a royalty base which includes receipts of the licensee from operations covered by the said expired Bender and Fearon patents.

### 128.

The Swift Patent No. 2,554,844 is not invalid because of prior public use by Well Surveys, Inc., its licensee Lane-Wells Company or anyone in privity or connected with said parties or the inventor, L. M. Swift. All use prior to March 22, 1945 of the invention covered by the Swift patent was experimental only and the patentee was in good faith in carrying on the experimental work that was done with the tool or apparatus covered by said patent.

### 129.

There was only one tool covered by said Swift patent in use prior to the crucial date of March 22, 1945, and there were improvements made in said tool from time to time. The patentee might well have concluded before the experimental work was finished that he had seen enough, but it was not undesirable nor. any indication of lack of good faith, that the precautions be taken that were taken. The use by Lane-Wells Co. of the Swift Casing Collar Locator assembled in radioactivity logging Instrument No. 225 assigned to truck No. 122 and later to truck No. 131 in wells of customers until sometime in the month of February 1945, was in the Houston District of the Gulf Coast area and later in February, said tool No. 225 with the Swift collar locator assembled therein and truck 131 were moved into the New Iberia District where different well conditions were encountered and the experimentation was continued there.

### 130.

The documentary evidence discloses repeated references by A. B. Winter and others to the Swift tool as being experimental in character, and while this is not conclusive, such references of these people made back in 1944 and 1945 when there was no reason to anticipate this litigation should be accorded great weight in determining what was in their minds at that time and as to their good faith in continuing their experiments with said tool prior to March 22, 1945.

### 131.

There were no efforts to sell the Swift tool or the use of said tool to customers prior to March 22, 1945. The tool was used with permission of customers and payment was received in that the tool was used in connection with the regular radioactivity logging service made available to the customer, but there was no extra charge made nor has there ever been any extra charge made for the use of the Swift invention as a part of said radioactivity logging service. The use to which the Swift apparatus was finally put as sales media was to represent to the customers that they were getting more for their money when they transacted business with Lane-Wells and got the benefit of the additional information disclosed on the log by the use of the combination of collar locator and radioactivity logging apparatus covered by the claims of the Swift patent.

### 132.

The use prior to March 22, 1945 by Oil Well Water Locating Company and others of various forms of tools and equipment in performing the Stratagraph logging service was not a prior

public use of the invention covered by the claims of the Swift patent No. 2,554,844.

### 133.

The use by Schlumberger Well Surveying Corp. of various forms of tools and equipment in performing its L.R.M. (Locating Radioactive Markers) service prior to March 22, 1945 was not a prior public use of the invention covered by the claims of the Swift Patent No. 2,-554,844.

Upon the foregoing findings of fact the Court hereby enters the following

### Conclusions of Law

1. This Court has jurisdiction of the subject matter of these actions and of the parties hereto under the patent Laws of the United States.

2. The Bender Reissue Patent No. 23,226 as to claims 14, 15, 16, 19 and 20 thereof is good and valid in law.

3. Claim 16 of the Bender Reissue Patent No. Re. 23,226 has been infringed by the manufacture, use and sale by McCullough Tool Company of apparatus for performing natural gamma ray logging and claims 14, 15, 16, 19 and 20 of said patent have been infringed by all of the natural gamma ray logging operations performed directly or indirectly for hire by the McCullough Tool Company prior to the expiration of said Bender patent.

4. The Fearon Patent No. 2,308,361 as to claims 2 and 3 thereof is good and valid in law.

5. Claim 3 of the Fearon Patent No. 2,308,361 has been infringed by the manufacture, use and sale by McCullough Tool Company of apparatus for performing neutron logging and claims 2 and 3 of said patent have been infringed by all of the neutron logging operations performed directly or indirectly for hire by the McCullough Tool Company prior to the expiration of said Fearon patent.

6. The Fearon Patent No. 2,390,433 as to claims 1, 4, 5, 10 and 13 thereof is invalid and void as failing to define invention over the prior art since the subject matter thereof would have been obvious to a person having ordinary skill in the art.

7. If valid, claims 4 and 5 of Fearon Patent No. 2,390,433 would have been infringed by the manufacture, use and sale by McCullough Tool Company of apparatus for performing gamma ray and netron logging simultaneously and, if valid, claims 1, 4, 5, 10 and 13 of said patent would have been infringed by all well logging operations performed by McCullough Tool Company directly or indirectly for hire wherein a gamma ray log and a neutron log were obtained simultaneously with the same subsurface logging tool.

8. The Swift Patent No. 2,554,844 as to Claims 1 to 6 inclusive thereof is good and valid in law.

9. Claims 1 to 6 inclusive of the Swift Patent No. 2,554,844 have been infringed by the manufacture, use and sale by McCullough Tool Company of apparatus for simultaneously making radioactivity measurements and locating the casing collars in a cased well and by all radioactivity well logging operations performed directly or indirectly for hire by McCullough Tool Company wherein radiation measurements and casing collar locations were made simultaneously with the same subsurface logging tool.

10. The Fearon Reissue Patent No. Re. 24,226 is good and valid in law as to claims 5 and 6 thereof, but reissue claims 9, 10 and 11 of said patent are invalid and void for laches in filing the application for reissue.

11. The Fearon Reissue Patent No. Re. 24,226 is a mere paper patent, and claims 5 and 6 thereof must therefore be construed to cover exactly what is shown in said patent and as so construed, said claims have not been infringed by the McCullough Tool Company.

12. The Pringle et al. Patent No. 2,-686,266, as to claims 1, 2, 5–10, 13, 14, 20, 21 and 22 thereof, is good and valid in law, but only if limited to scintillation counter apparatus used for the determination of energy characteristics of gamma rays by analyzing the electrical pulses generated by the gamma rays to determine energy characteristics either by variation of an integral discriminator

setting or by use of a differential discriminator.

13. Claims 1, 2, 5–10, 13, 14, 20, 21 and 22 of the Pringle, et al. Patent No. 2,686,266 have not been infringed by any apparatus made, used or sold by Well Surveys, Inc., Lane-Wells Company or Dresser Industries, Inc., except as used by Dresser Industries, Inc. in making that form of Chlorinilog which comprises a conventional neutron-gamma ray log made with a scintillation counter at a given discrimination level and a second neutron-gamma ray log made with the scintillation counter at a different discrimination level.

14. Claim 23 of the Pringle et al. Patent No. 2,686,266 has not been infringed by any apparatus made, used or sold by Well Surveys, Inc., Lane-Wells Company or Dresser Industries, Inc.

15. The Martin et al. Patent No. 2,686,268 as to claims 1, 2, 3, 6, 8, 15, 16, 17 and 18 is invalid and void as failing to define invention over the prior art.

16. If valid, claims 1, 2, 3, 6, 8, 15, 16, 17 and 18 of the Martin et al. Patent No. 2,686,268 would be infringed by the manufacture and sale by Well Surveys, Inc. and the sale and use by Lane-Wells Company and Dresser Industries, Inc. directly or indirectly for hire, of the scintillation counter radioactivity well logging apparatus in which refrigeration means in the subsurface tool is used for stabilizing the temperature of the scintillation counter.

17. Except as limited in time by Conclusion of Law No. 23, Well Surveys, Inc. is entitled to judgment against McCullough Tool Company for damages, to be assessed following an accounting, for infringement of Patents No. Re. 23,226, No. 2,308,361 and No. 2,554,844, and for an injunction in usual form against further infringement of Patent No. 2,554,-844. Said accounting and injunction should be stayed pending appeal if any in either of these actions.

18. The individual parties Pringle, Roulston and Brownell and their licensee McCullough Tool Company, as their interest may appear, are entitled to judgment against Dresser Industries, Inc. for damages, to be assessed following an accounting, for infringement of Patent No. 2,686,266 and for an injunction in usual form against further infringement of said patent. Said accounting and injunction should be stayed pending appeal if any in either of these actions.

19. The first cause of action (for declaratory relief) alleged in the amended complaint in Civil Action No. 3956 should be dismissed as to all patents of Well Surveys, Inc. mentioned therein except those patents as to which a dismissal has heretofore been entered and except those patents herein adjudicated as set forth in the foregoing conclusions of law.

20. There was no public use of the invention of the Swift Patent No. 2,-554,844 prior to March 22, 1945.

21. The Court has jurisdiction of the parties and of the subject matter presented upon the charge of McCullough Tool Company that Well Surveys, Incorporated has misused its patents.

22. Well Surveys, Incorporated misused its patents in suit for the period beginning June 11, 1940 and continuing until June 1, 1956, in violation of the policy of the United States relating to the grant, holding and exploitation of patents.

23. By reason of the misuse of its patents Well Surveys, Incorporated is precluded and barred from any recovery or relief against McCullough Tool Company for infringement of the patents in suit occurring prior to June 1, 1956.

24. Well Surveys, Incorporated has not misused its patents since June 1, 1956.

25. In view of the purge found to have been effected by Well Surveys, Incorporated as of June 1, 1956, the said corporation is entitled to enforce its valid patents against infringement occurring subsequent to the said date, notwithstanding the misuse found to have existed prior thereto.