395 F.2d 230
 McCULLOUGH TOOL COMPANY, Appellant,
v.
WELL SURVEYS, INC. (now by change of name Dresser Sie, Inc.), and Dresser Industries, Inc., Appellees.
McCULLOUGH TOOL COMPANY, Appellant,
v.
DRESSER INDUSTRIES, Inc., Appellee.
 No. 9426.
 No. 9427.
 United States Court of Appeals Tenth Circuit.
 May 16, 1968.<CR>
 
 Page 232
 R. Welton Whann, Los Angeles, Cal. (Richard B. McDermott, Tulsa, Okl., on the brief) for appellant.
 Robert K. Schumacher, Chicago, Ill., and Rufus S. Day, Jr., Cleveland, Ohio (Robert J. Woolsey, Tulsa, Okl., on the brief) for appellees.
 Before MURRAH, Chief Judge, and BREITENSTEIN and HILL, Circuit Judges.
 HILL, Circuit Judge.
 
 
 1
 This is an appeal by McCullough Tool Company, hereinafter called McCullough, from summary judgment rendered against it below in the combined civil actions Nos. 4271 and 6467. A long history of litigation between the two parties to this suit exists and the present appeal is substantially a continuation of that litigation.
 
 
 2
 Civil Action 4271 was an infringement action brought by Well Surveys, Inc., hereinafter called W.S.I.[1] A number of patents were involved in this suit including the Swift Patent, No. 2,554,884, which continues to be of interest in the instant appeal. In that initial litigation Judge Savage found the Swift Patent to be valid and infringed by McCullough. See D.C., 199 F.Supp. 374. This decision was affirmed by this court on appeal. See 343 F.2d 381.[2] On remand to the district court, an injunction was issued against McCullough prohibiting it "from directly or indirectly manufacturing, using or selling, or inducing, or causing to be manufactured, used or sold, apparatus for simultaneously making radioactivity measurements and locating the casing collars in a cased well as exemplified by W.S.I. Exhibit 10, page 5-A." In the interim, McCullough, apparently following the advice of counsel, modified its structure to avoid infringement of the Swift Patent. On June 14, 1966, McCullough filed an action for declaratory judgment, Civil Action No. 6467, asking that a determination be made that the new McCullough structure does not infringe the Swift Patent. Thereafter, on August 4, 1966, W.S.I. filed a motion asking the trial court to issue a citation for contempt against McCullough by reason of its use of the modified structure. Also on August 4, 1966, W.S.I. filed a motion to dismiss the declaratory judgment action. On October 19, 1966, McCullough filed a detailed motion asking for relief from the judgment in Civil Action No. 4271, dissolution of the June 15 injunction and a vacation of the order for accounting based upon W.S.I.'s misuse of its patents. On November 29, 1966, a pretrial hearing was held. At this time it was decided that the Civil Actions Nos. 4271 and 6467 could be consolidated for pretrial and trial.[3] Further, McCullough was ordered to show cause why it should not be held in contempt and the trial judge dismissed McCullough's motion to dissolve the injunction for failure to state a cause of action. On December 9, 1966, W.S.I. filed its answer to the declaratory judgment action and therein counterclaimed that McCullough was infringing its Swift Patent. On December 19, McCullough filed a reply to W.S.I.'s counterclaim wherein it was alleged that the modified structure did not infringe the Swift Patent and that W.S.I. should be barred from asserting infringement because of patent misuse. On December 28, 1966, McCullough filed its response to the motion to show cause in the contempt citation. Therein it was pleaded that the modified structure did not infringe the Swift Patent and did not come within the terms of the June 15 injunction and further that W.S.I. should be barred from asserting its patents because of misuse of these patents. On December 21, 1966, W.S.I. filed a motion for a summary judgment in the contempt proceeding and also asked the trial court to prevent McCullough from introducing evidence of misuse. On December 30, 1966, McCullough filed a motion to strike the cases from the court calendar for trial on January 12, 1967, on the basis that the parties were not prepared for trial due to the failure to complete discovery. This motion was allowed by the court, however, it was decided that a further pretrial hearing would be held on January 12, 1967. At that hearing, the court granted W.S.I.'s motion for summary judgment in the contempt citation and dismissed McCullough's declaratory judgment action.
 
 
 3
 McCullough argues error in the trial court's granting of summary judgment holding McCullough in contempt and thereby denying McCullough the opportunity to present evidence on five issues: (a) whether or not the claims of the Swift Patent can be construed broad enough to cover the new McCullough structure; (b) the content and effect of the prior art on determining whether or not the claims are of sufficient scope to be infringed by the new McCullough structure; (c) the difference in mode of operation of the device of the patent in suit and the new McCullough structure; (d) non-equivalency of elements and combinations of parts in McCullough's new structure, as compared to the structure of the patent in suit; and (e) misuse of the Swift Patent after the decision of March 16, 1961.
 
 
 4
 The question is presented as to how a patentee should be allowed to proceed when following a successful infringement suit the infringer modifies the infringing structure and continues as before. Allowing the patentee to proceed by a summary contempt proceeding in all cases would unnecessarily deter parties from marketing new devices that are legitimately outside the scope of the patent in question. On the other hand, to require in each instance the patentee to institute a new infringement suit diminishes the significance of the patent and the order of the court holding the patent to be valid and infringed. Obviously there must be a dividing point between those cases which should be handled by a summary contempt proceeding and those cases which should be more fully viewed in an infringement proceeding. Courts have uniformly held that the standard to be applied in determining the dividing point is whether the alleged offending device is "merely `colorably' different from the enjoined device or from the patent." Siebring v. Hansen, 8 Cir., 346 F.2d 474 at 477. See Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 95 F.2d 414; American Foundry & Mfg. Co. v. Josam Mfg. Co., 8 Cir., 79 F.2d 116; and Wadsworth Electric Mfg. Co. v. Westinghouse Electric & Mfg. Co., 6 Cir., 71 F.2d 850. It is further stated to be "well established that it is within the discretion of the trial court to determine whether the charge of infringement is to be determined in a contempt proceeding or in a separate action * * *." Baltz v. The Fair, 7 Cir., 279 F.2d 899 at 903. See, also, John W. Gottschalk Mfg. Co. v. Springfield Wire & Tinsel Co., 1 Cir., 90 F.2d 468. In Jamco, Inc. v. Carlson, 10 Cir., 274 F.2d 338, 343, this court held that a colorable modification of the device shown to have infringed a patent should be handled by contempt proceedings.[4]
 
 
 5
 In the instant case the trial judge determined that the "McCullough device is only a colorable variation of the Swift Patent," that the modified device "does the same work in substantially the same way to accomplish substantially the same result as the Swift device" and that the "modified apparatus comes within the scope of the claims in the Swift Patent." In proceeding with the contempt citation the trial court found that there was no genuine issue of material fact and, therefore, that W.S.I. was entitled to a judgment as a matter of law. There was clearly no error in the trial court's proceeding with the contempt citation rather than requiring the issue to be tried in an infringement hearing. We believe that the trial court was correct in summarily deciding that the modified device was a colorable variation of the Swift Patent, that it thus infringed the Swift Patent and violated the June 15 injunction. The validity of the Swift Patent and the scope of its claims were conclusively determined as between the two parties in the instant suit in the original infringement suit. See Krentler-Arnold Hinge Last Co. v. Leman, 1 Cir., 50 F.2d 699. And Wadsworth Electric Mfg. Co. v. Westinghouse Electric & Mfg. Co., supra. This conclusively answers McCullough's claims that it should be allowed to introduce evidence upon issues (a) and (b).
 
 
 6
 There is also no merit to McCullough's argument as to issues (c) and (d). The difference between the modified structure and the original device found to infringe the Swift Patent is sufficiently established in the record by an affidavit filed by McCullough to decide the issue of contempt.[5] This affidavit shows that the change in structure was to provide the casing collar locator signal with a separate amplifier and then connect it to the transmitting conductor whereas in the original device the signal from the casing collar locator was connected to a common amplifier which also amplified signals from the radiation detector. This change is merely a change in form with the new form serving the same function as the old, therefore, making the change a mere colorable variation justifying the trial court's finding of contempt. See Wadsworth Electric Mfg. Co. v. Westinghouse Electric & Mfg. Co., supra, 71 F. 2d at 852. We believe that the modified structure as shown by McCullough clearly infringes claims 1, 2, 5 and 6 of the Swift Patent as found by the trial judge. The relevant portions of these claims which cover the change in the McCullough device are: (1) in claim 1 "means for combining said first signal and the additional signal * * *"; (2) in claim 2 "means for introducing the last mentioned signals into the first detecting means to superimpose them on the signal characteristics of the phenomena being detected by said first detecting means, * * *"; (3) in claim 5 "means for introducing said signals into the transmitting means of said system, * * *"; and (4) in claim 6 "means for introducing said signals into the transmitting means of said system, * * *." There is clearly no limitation in any of these claims to the use of a common amplifier as urged by McCullough. Just as clearly, there is no limitation upon the scope of these claims found in the previous opinions holding the patent valid. Judge Savage in the original infringement suit found the invention inherent in the Swift Patent to be the combination of the radiation detector log with the depth indicators provided by the casing collar locators. See Well Surveys, Inc. v. McCullough Tool Co., D.C., 199 F.Supp. 374 at 386. Specifically with regard to the method of combining two signals Judge Savage stated: "The Swift Patent discloses a combination of a casing collar locator with a radiation detection system in which the casing collar signal and the radiation signal are electrically associated so that when the casing collar signal is imposed upon the radiation detection circuit, the radiation signal is interrupted. This interruption system is an illustration of but one of several available means for transmitting the casing collar signal and the radiation signal over the same cable, and none of the claims of the Swift Patent is limited to this system." Ibid.[6]
 
 
 7
 These trial court findings were completely affirmed by this court on appeal. See McCullough Tool Co. v. Well Surveys, Inc., 10 Cir., 343 F.2d 381, 391-394. The trial judge clearly found the invention to be the combination of the radiation detection system with the casing collar locator. Since there is nothing in the claims of the Swift Patent to limit the device to one where the combination occurs in a common amplifier the fact that in the modified McCullough structure the signals arising from the radiation detector and the casing collar locator were not combined in a common amplifier but were separately amplified and then transmitted along a single conductor to the recording system clearly does not have any bearing on the question of infringement and since this is the sole change as shown by McCullough's affidavit, the trial court was correct in finding that the modified structure was merely a colorable variation of the Swift Patent and, therefore, prohibited by the June 15 injunction.
 
 
 8
 McCullough further claims that W.S.I. should be estopped from claiming any combination which does not include a common amplifier because of filewrapper estoppel from the cancellation of an original claim 7. This argument was expressly discussed in the previous opinion by this court when it stated that "In this case, the original claims upon which McCullough relies to invoke the doctrine were not rejected because they were unpatentable over the prior art. They were rejected on the formal grounds of being improper method claims and therefore file-wrapper estoppel is not applicable." McCullough Tool Co. v. Well Surveys, Inc., supra, at 403.
 
 
 9
 McCullough further argues that the modified structure must come within the terms of the June 15 injunction and that this injunction only prohibited McCullough from manufacturing apparatus "exemplified by W.S.I. Exhibit 10 page 5-A," the original McCullough device found to infringe the Swift Patent. McCullough urges that not all devices infringing the Swift Patent necessarily come within the scope of the June 15 injunction. This is certainly true, but a colorable variation of the original McCullough device would certainly come within the terms of the claimed injunction or else the prohibition would be virtually meaningless. Since it was found that the modified McCullough structure was merely a colorable variation of the original structure there was no error in finding that it was prohibited by the June 15 injunction and that McCullough by marketing such a device was in contempt.
 
 
 10
 The remaining major issue concerns the necessity of a hearing on the alleged misuse by W.S.I. At the November 29, 1966, pretrial it was held that the allegations concerning patent misuse made by McCullough and the affidavits submitted by McCullough to support these allegations did not present a cause of action in that the affidavits only evidenced that W.S.I. was enforcing the rights granted to it by its various patents. No appeal was taken from this dismissal but the same issue was presented by McCullough in its answer to the show cause order and in its reply to W.S.I.'s counterclaim in the declaratory judgment action. Although the trial judge did not make any specific reference to the misuse issue the summary judgment necessarily implies that the decision rendered on McCullough's motion to dissolve the injunction still applied. The opinion expressed at the November 29th pretrial hearing was that the affidavits showed no more than that W.S.I. was pursuing a valid policy to enforce its patents. The first question to be discussed by this court is whether the misuse issue could be disposed of by summary judgment.
 
 
 11
 It is, of course, elementary that to be suitable for summary judgment there must not exist any material factual disputes. Smoot v. Chicago, Rock Island and Pacific R. R. Co., 10 Cir., 378 F.2d 879; Frey v. Frankel, 10 Cir., 361 F.2d 437; Bushman Construction Co. v. Conner, 10 Cir., 307 F.2d 888. Affidavits may be presented by both sides, however, the affidavits are to be used only to present the available facts, and not to decide the factual issues which might be presented. See Smoot v. Chicago, Rock Island and Pacific R. R. Co., supra. No affidavits were submitted by W.S.I. pursuant to its motion for summary order rather it relied upon the considerable amount of material that was already in the record.[7]
 
 
 12
 McCullough's motion, supporting briefs, and affidavits contained many allegations concerning W.S.I.'s misuse of its patents. The general allegations made by McCullough with respect to the specific wrongdoings of W.S.I. were that it monopolized or attempted to monopolize the part of the well survey industry comprising simultaneous logging and collar locating, particularly through improper extension of their patent monopoly and through unfounded infringement threats and litigation. Further, McCullough alleged that W.S.I. engaged in an illegal program of coercion of well survey operators in the industry which consisted of groundless threats of litigation, followed by the filing and prosecution of unfounded law suits, with the result that many comparatively impecunious well survey operators, being unable to stand litigation costs, had been compelled to take licenses or immunity agreements and pay royalties for their use of unpatented equipment. W.S.I. is alleged to have engaged in a plan of oppressive litigation wherein well survey operators have repeatedly been sued on a group of eight or ten patents, while plaintiff knew, or should have known, that there was no basis whatsoever for their claim of infringement of most of the patents involved. Further, McCullough alleges that W.S.I. had misrepresented to the public and the operators in the well survey field the scope of the Swift Patent and the previous court decisions interpreting the scope of this patent.
 
 
 13
 McCullough's primary allegation of misuse is that W.S.I. is seeking to unlawfully extend its patent monopoly beyond the scope of the Swift Patent. This allegation is based on the premise that the scope of the Swift Patent is limited to a survey device whereby the signals from the radiation detector and the casing collar locator are transmitted to the surface by a single conductor. W.S.I. sought to and did license several well survey operators who performed their surveys with multi-conductor devices, that is a survey device whereby the radiation detector signal is transmitted to the recording system by a different conductor than the casing collar locator signal.
 
 
 14
 It is difficult to believe that the above allegations would constitute a misuse of a patent. The authorities cited by McCullough concern situations where a patentee seeks to "tie" an unpatented product to the sale of his patented product. See Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461. McCullough extracts from these cases language to the effect that the patentee is strictly limited to the terms of his grant. To apply this language, however, to the present situation would place a grave restriction upon the valid rights of a patent holder. Conceivably, if a licensing program was initiated and carried out in connection with a scheme to monopolize an industry as found in Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416, and the patentee sought by coercion and threats to license devices outside the established scope of his invention a court would be justified in denying the patentee the benefits of his patent. In the present situation, however, it has been expressly stated by Judge Savage that after June 1, 1956, "W.S.I. no longer dominated instrument and apparatus supply for practice of radioactivity well logging, and after that date its refusal to sell its apparatus was not a compelling factor in its license contracting. * * * Following June 1, 1956, W.S.I. was not dominant in the market for the sale of instruments and apparatus for radioactivity well surveying. After the said date the refusal of W.S.I. to sell its apparatus to others than its research and service licensees was reasonable and did not tend to eliminate competition and did not have an anti-competitive effect." Well Surveys, Inc. v. McCullough Tool Co., 199 F.Supp. 374, at 394. The allegations and affidavits presented by McCullough, taken as a whole, do not support a claim that W.S.I. has changed its position as to create an illegal monopoly since the above finding was made by Judge Savage in 1961. Further, it is affirmatively clear from these allegations and affidavits that W.S.I. had considerable competition in the area of radioactive well surveys.
 
 
 15
 Additionally, we believe it is established beyond any doubt from the previous opinions in this case and the facts and evidence in the record that a reasonable basis exists for W.S.I. to assert that the Swift Patent covers the multi-conductor survey devices. McCullough bases its counter-argument upon the fact that much of the language of the previous suit speaks in terms of a single conductor device. This is only natural, however, as the infringing device and the device shown by the Swift Patent all had a single conductor from the detection devices to the recording system. This does not mean, however, that the previous opinions were considering the question of a multi-conductor system or limiting the Swift Patent to a single conductor system. On the contrary, an examination of these opinions show that the court considered the invention of the Swift Patent to be the combination of a radiation log measurement with the fixed depth determination by the casing collars so that a comparison of the two records could be made, notwithstanding how the signals were transmitted to the recording system.[8] Introduced into the record by W.S.I. is an opinion written by a Chicago patent firm to the effect that claims 5 and 6 of the Swift Patent would be broad enough to cover a multi-conductor system. The law set forth in this opinion and the wording of the previous opinions by Judge Savage and this court clearly provided W.S.I. with a reasonable basis for believing that multi-conductor systems were covered by the Swift Patent. We do not believe that the question as to whether these multi-conductor systems are covered by the Swift Patent has to be decided in the instant case. The only issue presented is whether an attempt by W.S.I. to license multi-conductor devices could possibly be considered made in bad faith and with an illegal intent. Due to the fact that there is no showing of an increased domination by W.S.I. in the radioactivity survey field and the fact that the previous opinions clearly do not limit W.S.I. to a single conductor system McCullough's argument as to the misuse of W.S.I. concerning their licensing program under the Swift Patent does not present a valid issue.
 
 
 16
 A further allegation of misuse made by McCullough is that W.S.I. participated in a program of coercion and intimidation by bringing unfounded law suits based upon 8 to 10 of W.S.I.'s patents for the purpose of forcing oil well operators into submitting to licensing agreements. The facts set out in McCullough's affidavit show that W.S.I. sued approximately 15 different operators for infringement of 8 to 10 different patents. It frequently developed in these cases that some of the allegations of infringement by W.S.I. were dismissed after discovery procedures in the cases. It is McCullough's contention that W.S.I. had knowledge of the fact that the majority of the patents sued upon were not infringed but merely added these allegations to the suits in order to make the litigation more expensive for the well survey operators. Such a course of action, according to McCullough, constitutes misuse of W.S.I.'s patent pool sufficient to deny W.S.I. the benefits of the Swift Patent. However, as developed above, it is clear that W.S.I. had a reasonable basis for alleging infringement by these various operators of the Swift Patent. Since the Swift Patent is the only patent involved in the instant suit and is the patent which W.S.I. is seeking to enforce against McCullough, it is difficult to see how the misuse alleged by McCullough of the remainder of the patents in W.S.I.'s patent pool deny it the benefit of the Swift Patent. The defense of misuse is, of course, an outgrowth of the equitable principle of unclean hands. See Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363. It is, however, a further maxim of equity that it is not every misconduct which will cause a court to apply the doctrine of unclean hands. Rather, as stated by this court, in Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303, 307: "[T]he application of the maxim is based upon conscience and good faith, and is confined to misconduct in relation to or in all events connected with the matter in litigation so that it in some manner affects the equitable relations of the parties to the suit. It does not extend to misconduct which is unconnected with the matter in litigation, and with which the party who asserts the maxim as a defense to his wrong has no concern." See also Hoehn v. Crews, 10 Cir., 144 F.2d 665 at 672. This principle has been applied in patent cases by allowing the defense of patent misuse only where there had been a misuse of the patent in suit. See Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 7 Cir., 281 F.2d 252, cert. granted, 364 U.S. 926, 81 S.Ct. 353, 5 L. Ed.2d 265, writ dismissed, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239; Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 7 Cir., 238 F.2d 867; and Eversharp, Inc. v. Fisher Pen Co., D.C., 204 F.Supp. 649. Applying this doctrine in the instant suit means that McCullough's allegation failed to state a claim of misuse against W.S.I.
 
 
 17
 McCullough brings up further allegations of an illegal patent pool and illegal royalties demanded by W.S.I. There is no showing made in the affidavits submitted by McCullough as to the extent of a patent pool acquired by W. S.I. or that W.S.I. has gone out into the market to purchase patents from competitors. A patent pool is not illegal by itself. Cole v. Hughes Tool Co., 10 Cir., 215 F.2d 924, 935. It must be either illegally acquired or illegally used. Ibid. There has been no showing that the patents held by W.S.I. are an illegal patent pool in this sense. Further W.S.I. argues that it shows in the record that the 80 patents held by W.S.I. were patents on inventions made by W.S.I.'s own employees or agents. W.S.I. acknowledges that it holds grants of licensing rights under the Schlumberger and Pan Geo Atlas Patents but that these are all non-exclusive. W.S.I. further points out that McCullough argued before Judge Savage that there was an illegal patent pool but that Judge Savage found no illegal pooling. As to McCullough's allegations of illegal and excessive royalties, this court specifically found that the royalties system employed by W.S.I. was valid. McCullough Tool Co. v. Well Surveys, Inc., supra, 343 F.2d at 409. No new allegations or arguments are presented by McCullough to show a need to re-examine this issue. As to these additional issues then it is clear that the trial judge in this case was not in error in summarily deciding that they did not present an issue.
 
 
 18
 McCullough further alleges that W.S.I. deliberately excluded them from their patent pool and cross licensing agreements and that such a refusal to grant a license to McCullough on the same terms as others comprises a violation of the antitrust laws, since the purpose of such refusal is to establish and maintain a monopoly. However, the facts alleged and expressed in McCullough's affidavit show only that W.S.I. refused to agree to the terms demanded by McCullough in particular that McCullough be granted a license under the Swift Patent in exchange for a license taken under McCullough's Pringle Patent. There is no allegation that W.S.I. would refuse to grant McCullough a license agreement under its standard royalty payments. It was an express finding of Judge Savage that W.S.I. has at all times since June 1, 1956, been willing to grant licenses under its patents individually or collectively under negotiable reasonable terms. Wells Surveys, Inc. v. McCullough Tool Company, 199 F.Supp. 374, 395. W.S.I. alleges that it has made repeated offers to this effect to McCullough. The facts alleged by McCullough in their affidavit simply do not show any reasonable refusal on the part of W.S.I. to grant a license under the Swift Patent to McCullough.
 
 
 19
 McCullough has also alleged that W.S.I. has misrepresented to various parties the scope of their patent as set out by this court's decision and Judge Savage's decision. This allegation is, however, not supported by McCullough's affidavits as they show only that W.S.I. said that the court's decisions had held the Swift Patent to be valid and that McCullough had infringed the Swift Patent. This distinguishes the instant situation from Art Metal Works v. Abraham & Straus, 2 Cir., 70 F.2d 641, cited by McCullough. In this respect McCullough relies upon a statement made by Jay Beaver, a Vice President of W.S.I., who stated to several potential licensees with regard to multi-conductor systems that W.S.I. had many licensees who interpreted the Swift Patent along with W.S.I. to cover multi-conductor systems. McCullough claims that the affidavits submitted by it clearly show that this was not the interpretation of the various licensees but that they had been forced to take the licenses to cover their multi-conductor system. Notwithstanding these allegations, it is a fair statement for W.S.I. to make that the interpretation of those who took licenses to cover their multi-conductor systems was that the systems were covered by the Swift Patent.
 
 
 20
 McCullough further alleges misuse because in the license agreement granted to Sand Surveys, Inc., the statement is made that coverage goes to operations involving "any fixed depth control marker." As McCullough correctly points out, this would be an extension beyond any conceivable scope of the Swift Patent, which must be limited to depth location by casing collar locations. However, W.S.I. has shown by its affidavits that this statement was added to the license agreement under the impetus of Sand Surveys, Inc. Such an isolated incident cannot be construed to constitute misuse of the Swift Patent sufficient to deny W.S.I. the rights of their patent monopoly. The Sand Surveys agreement was only one agreement out of 80 to 100 licensing agreements granted by W.S.I. and the fact that the offending language was desired by the licensee and not W.S.I. suffices to place the case outside the scope of misuse of the Swift Patent.
 
 
 21
 The scope of the misuse doctrine has not been clearly defined. It has been recognized by the Attorney General's National Committee to study the Antitrust Laws that "there may be misuse of the defense of antitrust violation * * *." The Committee felt this was "basically a problem of judicial control," and recommended "that the courts should make full use of their powers to curb such attempts to defeat justice. Useful methods include pretrial procedures to ascertain whether a good faith antitrust defense is presented." Att'y General Nat'l Comm. Antitrust Rep. pp. 248, 249. We believe the above statements apply to the instant case and more particularly we agree with the trial judge when he states that the affidavits submitted by McCullough show nothing more than the pursuance of a valid program to obtain the benefit of the Swift Patent. To further prolong the litigation by requiring a hearing on McCullough's allegations of misuse would be a needless waste of judicial time.
 
 
 22
 A further claim by McCullough is that it was error for the district court to summarily decide the case without allowing it to introduce further witnesses and evidence with regard to the misuse issue other than the affidavits included with the motion to dissolve the injunction. At the pretrial hearing on November 29, when the trial judge denied the motion to dissolve the injunction, it was pointed out by McCullough's attorneys that the misuse issue would again come up as a defense to the show cause contempt citation and as a defense to W.S.I.'s counterclaim in the declaratory judgment action. W.S.I.'s counsel attempted to have the issue barred from being raised at trial, i. e., from allowing McCullough to introduce further evidence. At that time the trial judge held that the issue could be raised only if McCullough were to submit additional evidence or a list of additional witnesses which it intended to introduce at the trial to show that W.S.I. had misused the Swift Patent. McCullough was given a 20 day limitation within which to submit the additional evidence and witnesses. This time was partly based upon the amount of time it would take W.S.I. to submit to McCullough various documents which had been asked for by discovery procedure. These documents were produced on December 6, 1966, 7 days after the pretrial but McCullough alleged in a later motion to strike the cause from trial on January 12 that the production was limited and required it to seek out other documents from another law suit, therefore, delaying McCullough from producing additional evidence. Also alleged in the motion to strike the cause from trial was that W. S.I. had not answered various interrogatories filed by McCullough on December 19.[9] These interrogatories were answered on January 3, 1967, within the 15 days allowed by Federal Rules of Civil Procedure, Rule 33. As previously noted, on December 21, W.S.I. filed a motion for summary order in the contempt citation. McCullough's failure to respond to this motion for summary judgment with an additional list of witnesses and additional information knowing that such would be required before the misuse defense could be entertained in the pretrial hearing is sufficient to deny McCullough's position that it was error to issue summary judgment without allowing it to introduce further evidence. The simple fact is that it was McCullough's burden to produce the witnesses and evidence. The facts do not indicate that the evidence was not within McCullough's hands in sufficient time to comply with this order before the January 12 pre-hearing and decision of summary judgment.
 
 
 23
 The orders appealed from are affirmed.
 
 
 
 Notes:
 
 
 [1]
 Dresser, Inc., is the present owner of the Swift Patent and is a co-appellee with W. S. I. For purposes of this opinion, there is no difference between the two and has been the practice throughout the proceedings appellees will be referred to as W. S. I
 
 
 [2]
 These previous opinions contain excellent accounts of the factual situations concerning the well survey industry and the Swift Patent that make unnecessary any extensive factual discussion in the present opinion
 
 
 [3]
 A finding of contempt would require the determination that the modified structure came within the June 15th injunction which necessarily means it infringes the Swift Patent
 
 
 [4]
 The cases cited by McCullough in support of the argument that summary contempt proceedings were erroneous are not contradictory with these decisions. See Locklin v. Switzer Brothers, Inc., 9 Cir., 348 F.2d 244; E-I-M Company v. Philadelphia Gear Works, 5 Cir., 223 F.2d 36; Union Carbide & Carbon Corp. v. Garver Tank & Mfg. Co., 7 Cir., 196 F.2d 103
 
 
 [5]
 It it clear that this affidavit may be taken as establishing the structure of the modified device sufficient to determine whether it infringes the Swift Patent. See Chan Wing Cheung v. Hamilton, 1 Cir., 298 F.2d 459
 
 
 [6]
 Judge Savage further said:
 "The new combination of elements forming the Swift invention and their new mode of operation were not obvious to those skilled in the art at the time the Swift application was filed.
 "63.
 "Magnetic casing collar locators and radioactivity well logging systems were separately known long prior to the invention of the Swift Patent. It was also old prior to the invention of the Swift Patent to transmit multiple signals over a common conductor.
 "The well logging apparatus with a casing collar locator defined by the claims in issue of the Swift Patent is of great utility and value; it was not obvious, but was the result of invention by the patentee; and is not anticipated by, but displayed substantial inventive advance over the prior art in evidence." Well Surveys, Inc. v. McCullough Tool Co., supra, at 387.
 
 
 [7]
 It is clear that a movant for summary judgment may rely upon affidavits already in the record. Chan Wing Cheung v. Hamilton, 1 Cir., 298 F.2d 459; 6 Moore, Federal Practice, ¶ 56.15[3], p. 2340
 
 
 [8]
 Finding of Fact No. 57 of Judge Savage states: "The Swift Patent is concerned with utilizing the casing collars which are permanently fixed in a cased well as bench marks, making radiation measurements relating to the positions of these bench marks, and recording the radiation measurements and the indications of the bench marks simultaneously to provide a radioactivity well log in which the radiation measurements are accurately recorded as a function of depth as indicated by the casing collar indications. This is a new combination of elements which produces a new and useful result." Well Surveys, Inc. v. McCullough Tool Co., supra, at 386. This plainly illustrates that Judge Savage considered the invention to be the combination of the two recordings and not the fact that the recording signals were combined in a single conductor to be transmitted to the recording system as urged by McCullough
 
 
 [9]
 An examination of these interrogatories reveals that no information was sought which could be considered helpful on the issue of misuse if, as discussed above, it was not misuse to license multi-conductor survey devices